Filed 4/27/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| Estate of NORMAN CASSERLEY, Deceased. | D072298 |
| THERESA HAWKINS, as administrator, etc., | |
| Plaintiff and Respondent, | (Super. Ct. No. 37-2015-00033629-PR-LA-CTL) |
| v. | |
| EMERITA CRUZ JOYA, | |
| Objector and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Julia C. Kelety, Judge. Affirmed.

Legler & Tomlinson and Thomas M. Tomlinson for Objector and Appellant.

Preovolos Lewin & Hezlop, Carl J. Jones and Thanasi K. Preovolos for Plaintiff and Respondent.

Emerita Cruz Joya appeals from a probate court order approving the final accounting and settling the estate of Norman Casserley (Decedent). Joya had filed a creditor's claim against Decedent's estate based on a criminal restitution order entered in her husband's favor, which was recorded after Decedent's death. The court rejected Joya's argument that her claim was entitled to priority either as a recorded lien or under the state Constitution's restitution provision. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Restitution Award and Original Abstract*

Decedent and Paul Blazevich were once neighbors. A conflict arose between them (the nature of which is not revealed in the record), as a result of which Decedent was convicted of a crime that entitled Blazevich to restitution. On May 21, 1997, Decedent was ordered to pay Blazevich restitution totaling $17,796, plus 10 percent interest from the date of sentencing.

About 10 years later, on October 9, 2007, Blazevich obtained an "order for restitution and abstract of judgment" (capitalization omitted; hereafter, Original Abstract) from the court and recorded it.

### *Amended Abstract*

About one week later, on October 17, 2007, Blazevich obtained an "amended order for restitution and abstract of judgment" (capitalization omitted; hereafter, Amended Abstract). The Amended Abstract reflected an additional $27,000 restitution award, bringing the total to $44,796. The record does not indicate the basis for the additional award. In addition to the new $27,000 award, the Amended Abstract indicated the balance

2

then due under the Original Abstract had grown from $17,796 to $36,532.93 (presumably due to accrued interest on the $17,796).

Blazevich did not immediately record the Amended Abstract.

*Assignment of Judgment*

On February 8, 2008, Blazevich executed and recorded an assignment of judgment (Assignment) in favor of his wife, Joya. The Assignment referred only to the Original Abstract, but purported to convey Blazevich's interest in "all rights accrued or to accrue under that judgment."

*Probate Estate*

On July 3, 2015, Decedent died intestate, with no surviving spouse, children, parents, or grandparents. The respondent in this appeal, Theresa Hawkins (Administrator), filed a probate petition seeking issuance of letters of administration and appointment as the estate's personal representative.[1] On January 21, 2016, the probate court appointed Administrator

---

1    " 'The "personal representative" is the person or firm appointed by the probate court to administer the probate of a decedent's estate. [Citation.] The personal representative may be the executor, who is the person named as such in the decedent's will, or it may be the successor to the executor, *or an administrator appointed by the court where the decedent died without a will naming an executor* [citation].' " (*Estate of Wong* (2012) 207 Cal.App.4th 366, 375, fn. 3, italics added.) "It is the duty of the personal representative to collect estate assets and preserve them until distribution, to pay claims against the estate including taxes and the charges of administration, and to distribute the residue to those entitled." (*Estate of Gerber* (1977) 73 Cal.App.3d 96, 109; Prob. Code, § 9650.)

Administrator described herself to the probate court as "a private professional fiduciary" licensed by the Professional Fiduciaries Bureau. She sought appointment as the administrator inasmuch as she was unable to locate any of Decedent's next of kin, and the county's public administrator declined to exercise priority. (See Prob. Code, § 8461 [specifying the order of priority for persons entitled to appointment as administrator].)

3

as the personal representative of Decedent's estate, with "full authority . . . to administer the estate without court supervision under the Independent Administration of Estates Act."[2]

The San Diego County Public Administrator and the California Department of Health Care Services—each an unsecured creditor—filed claims against the estate for $1,379.50 and $147,766.69, respectively.

Administrator determined the only asset in Decedent's estate was his residence. She listed it for sale on May 16, 2016, and about one week later accepted an offer of $172,000, with a 10-day escrow period.

*Joya's Claim*

About one week into the escrow period, Blazevich contacted Administrator and explained that he had obtained an Amended Abstract but was unable to locate it. Blazevich asked that the Administrator accept a retired judge's affidavit attesting to the Amended Abstract as proof of its underlying obligation. Administrator declined and explained that the unrecorded Amended Abstract did not encumber the residence. Administrator encouraged Blazevich and his wife to submit their claim as to the recorded Original Abstract as soon as possible so that escrow could close.

Neither Blazevich nor Joya immediately submitted a creditor's claim, which delayed the close of escrow. To encourage them to submit an appropriate claim, Administrator

---

[2] Full authority under the Independent Administration of Estates Act includes (among other things) the authority to sell real property and to allow or reject creditors' claims without prior court approval. (Prob. Code, §§ 10511, 10552, subd. (a).)

4

agreed not to distribute the sale proceeds to other creditors until the probate court resolved the parties' claims regarding the Amended Abstract.

On June 10, 2016, Joya filed a creditor's claim for $178,000. She acknowledged in her claim that only the Original Abstract had been recorded, and, thus, a dispute existed as to whether the entire restitution award was secured.

On June 22, 2016—nearly one year after Decedent's death—the Amended Abstract was recorded.

Escrow closed on July 8, 2016, and Joya received $51,867.04 from the sale proceeds.[3]

One week later, Joya filed an amended creditor's claim for $93,358.22. On the Original Abstract, Joya acknowledged receipt of the funds from escrow, as well as an additional payment of $2,064.92 (the details of which are unclear from the record), but Joya claimed there was still a balance due of $14,569.72.[4] On the Amended Abstract, Joya claimed a balance due of $78,788.50.[5] In light of Joya's amended claim and the other creditors' earlier-filed claims, Administrator determined the estate was insolvent.

---

[3]    The funds released to Joya from escrow appear to approximate 10 percent interest accruing from the date restitution of $17,796 was ordered (May 21, 1997) to the date escrow closed (July 8, 2016).

[4]    In light of the funds released to Joya from escrow, the record does not make clear Joya's basis for this additional claim on the Original Abstract.

[5]    The record does not make clear how Joya calculated this amount.

On September 20, 2016, Administrator filed her "First and Final Account and Report of Administrator and Petition for Settlement" (Final Accounting). In it, Administrator proposed treating Joya's, the county's, and the state's claims all as unsecured general debts entitled to the lowest level of priority.[6] Administrator disputed a portion of Joya's amended claim, and rejected Joya's view that her claim was entitled to priority over the county's or the state's unsecured claims. First, Administrator asserted that because the Amended Abstract was not recorded until after Decedent's death, the debt based on that abstract was governed by the Probate Code's provisions regarding general unsecured debts (see fn. 6, *ante*), not the Code of Civil Procedure's provisions regarding enforcement of judgments.[7]

Second, Administrator argued the amended claim's provenance as a criminal restitution order did not entitle it to preference under the California Constitution's restitution provision, which states: "All monetary payments, monies, and property collected from any

---

[6] Probate Code section 11420, subdivision (a) specifies the following order of priority for payment of creditors' claims: (1) administrative expenses; (2) secured debts; (3) funeral expenses; (4) expenses of last illness; (5) family allowance; (6) wage claims; and (7) "[g]eneral debts, including judgments not secured by a lien . . . ."

[7] Code of Civil Procedure section 686.020 states: "After the death of the judgment debtor, enforcement of a judgment against property in the judgment debtor's estate is governed by the Probate Code, and not [Title 9 of Part 2 of the Code of Civil Procedure]."
Probate Code section 9300 states: "[A]fter the death of the decedent all money judgments against the decedent or against the personal representative on a claim against the decedent or estate are payable in the course of administration and are not enforceable against property in the estate of the decedent under the Enforcement of Judgments Law (Title 9 (commencing with Section 680.010) of Part 2 of the Code of Civil Procedure)."

person who has been ordered to make restitution shall be first applied to pay the amounts ordered as restitution to the victim." (Cal. Const., art. I, § 28, subd. (b)(13)(C).)

Joya filed an objection to the Final Accounting. She maintained the postdeath recordation of the Amended Abstract created a lien on probate estate assets, irrespective of Code of Civil Procedure section 686.020. She also insisted her claim was entitled to priority under the Constitution's restitution provision.

### *Probate Court's Ruling*

The probate court found Joya's claim was unsecured and, therefore, not entitled to priority over the county's or the state's claims. The court rejected Joya's lien theory, reasoning that Joya's creation of a lien against probate estate assets was tantamount to enforcing a judgment because the only reason Joya created the lien was to establish higher claim-distribution priority.

The court also rejected Joya's constitutional priority argument, explaining that because restitution orders are "enforceable by a victim as if [they] . . . were a civil judgment" (Pen. Code,[8] § 1214, subd. (b)), and because civil judgments not recorded before the debtor's death are governed by the Probate Code (and not the judgment-enforcement provisions of the Code of Civil Procedure), the restitution order was not entitled to priority under the Constitution.

Joya appeals.

---

[8]    Undesignated statutory references are to the Penal Code.

7

## DISCUSSION

### I. *Standing*

Each party contends the other lacks standing to participate in this appeal. We disagree.

### A. *Joya's Standing*

Administrator contends Joya lacks standing because this appeal concerns only the *Amended* Abstract, and Blazevich assigned to Joya only his interest in the *Original* Abstract. Administrator reasons Blazevich must not have intended to assign his rights under the Amended Abstract to Joya because he was aware of the Amended Abstract when he executed the Assignment, yet he did not expressly refer to it.

Joya counters that Administrator forfeited this challenge by failing to raise it in the probate court. Alternatively, Joya maintains she has standing because the Assignment expressly states it conveys all of Blazevich's interest in the Original Abstract, "together with all rights accrued or *to accrue* under that judgment." (Italics added.)

Administrator's challenge to Joya's standing raises a factual issue regarding Blazevich's intent. Because Administrator did not raise this issue in the probate court, we will not consider it on appeal and reject Administrator's lack-of-standing argument. (See *Krechuniak v. Noorzoy* (2017) 11 Cal.App.5th 713, 726 [where a " 'new theory contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial[,] the opposing party should not be required to defend against it on appeal.' "].)

8

B. *Administrator's Standing*

Joya contends Administrator lacks "standing to participate in this appeal" because she is not "aggrieved."   We disagree.

"[I]f a claim 'may diminish the estate to be finally distributed, or may make the fund from which the creditors are to be paid insufficient for that purpose, the administrator is interested, and in the event of an adverse ruling is a party aggrieved.' "  (*Estate of Kessler* (1948) 32 Cal.2d 367, 370 (*Kessler*);[9] see *Estate of Goulet* (1995) 10 Cal.4th 1074, 1082 [same]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2017) ¶ 2:308, p. 2-198 ["Representative parties . . . have standing to appeal a judgment or order that is *detrimental* to the estate, trust or fund that they represent (e.g., an order that effectively diminishes the estate, trust or fund, or renders it inadequate to pay creditors)."].)

Administrator was responsible for ensuring the proper distribution of estate assets to creditors with bona fide claims.  Allowing Joya's disputed claim to attain priority would have been detrimental to the estate because it would have left insufficient funds to satisfy the county's and the state's undisputed claims.  Thus, Administrator has standing to represent the estate's interests in this appeal.

---

[9]    Joya cites a different passage in *Kessler*, in which the court recites the *general rule* that the administrator of an estate is not an interested party.  (*Kessler*, *supra*, 32 Cal.2d at p. 369.) However, in the following paragraphs, the *Kessler* court explains that the general rule does not apply when—as is the case here—estate assets are insufficient to satisfy all creditors' claims.  (*Id.* at pp. 369-370.)

## II. *Postdeath Recordation of the Amended Abstract Did Not Create a Lien*

We easily dispose of Joya's claim that the recordation of the Amended Abstract after Decedent's death created a lien against his probate estate assets. Section 686.020 of the Code of Civil Procedure states: "After the death of the judgment debtor, enforcement of a judgment against property in the judgment debtor's estate is governed by the Probate Code, and not by this title." The Law Revision Commission Comments to this section—which are " 'deemed to express the Legislature's intent' " (*Guardianship of Ann S*. (2009) 45 Cal.4th 1110, 1137-1138, fn. 20)—clearly state "*the filing of an abstract of judgment after death of the judgment debtor does not create a lien on estate property*." (Cal. Law Revision Com. com., 16B West's Ann. Code Civ. Proc. (2009 ed.) foll. § 686.020, p. 224, italics added). Thus, because the Amended Abstract was recorded after Decedent's death, the probate court correctly found the abstract did not create a lien on estate assets.

## III. *The Constitution's Restitution Provision Does Not Apply Here*

### A. *Relevant Legal Principles*

We review de novo the interpretation of a constitutional provision. (*People v. Arroyo* (2016) 62 Cal.4th 589, 593 (*Arroyo*).) "[O]ur interpretation of a ballot initiative is governed by the same rules that apply in construing a statute enacted by the Legislature. [Citations.] We therefore first look to 'the language of the statute, affording the words their ordinary and usual meaning and viewing them in their statutory context.' " (*People v. Park* (2013) 56 Cal.4th 782, 796 (*Park*); *Arroyo*, at p. 593 ["[t]he statutory language must also be construed in the context of . . . the overall statutory scheme"].) " ' "When statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it."

10

[Citation.]' " (*People v. Hendrix* (1997) 16 Cal.4th 508, 512.)  However, " ' "[w]hen the language is ambiguous, 'we refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet.' " ' " [Citation.] 'In other words, our "task is simply to interpret and apply the initiative's language so as to effectuate the electorate's intent." ' " (*Arroyo*, at p. 593; see *People v. Valencia* (2017) 3 Cal.5th 347, 364 (*Valencia*) ["we examine the materials that were before the voters."].)  " 'Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation.' " (*Valencia*, at p. 358.)

"In 1982, California voters passed Proposition 8, also known as The Victims' Bill of Rights," which "added article I, section 28, subdivision (b) to the California Constitution[.]" (*People v. Giordano* (2007) 42 Cal.4th 644, 652 (*Giordano*).)  This provision mandated that "[r]estitution shall be ordered from the convicted persons in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss, *unless compelling and extraordinary reasons exist to the contrary*." (Former Cal. Const., art. I, § 28, subd. (b), as adopted June 8, 1982, italics added; *People v. Gross* (2015) 238 Cal.App.4th 1313, 1318 (*Gross*).)

In response, " '[t]he Legislature has enacted, and frequently amended, a bewildering array of responsive statutes.' " (*Giordano*, *supra*, 42 Cal.4th at p. 652.)  For example, in 1983, the Legislature enacted section 1202.4, which, over the years, "consolidated much of the state's victim restitution scheme." (*Giordano*, at p. 653; see *Luis M. v. Superior Court* (2014) 59 Cal.4th 300, 304.)  As it read in 2008, section 1202.4 directed trial courts to order convicted defendants to pay restitution directly to any victim who suffered losses as a result

11

of the defendant's crime, and to pay a restitution fine to a state fund that compensates crime victims. (Former § 1202.4, subds. (a)-(f); *Gross*, *supra*, 238 Cal.App.4th at p. 1318.) The statute gave courts the discretion not to order payment of direct restitution or a restitution fine if the court found "compelling and extraordinary reasons for not doing so." (Former § 1202.4, subds. (b), (c), (f).)

In 2008, voters passed Proposition 9, also known as Marsy's Law, which "provides for a broad spectrum of victims' rights, including restitution." (*Gross*, *supra*, 238 Cal.App.4th at p. 1317.)[10] As relevant here, Marsy's Law eliminated trial courts' discretion to not order direct victim restitution,[11] and added a new provision regarding payment of victim restitution orders. Article I, section 28, subdivision (b) now reads:

> "(b) In order to preserve and protect a victim's rights to justice and due process, a victim shall be entitled to the following rights: [¶] . . . [¶]
>
> "(13) To restitution.
>
> "(A) It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer.

---

[10] Apart from restitution, Marsy's Law recognizes victims' rights by (among other things) granting them additional rights of notice and participation in criminal proceedings, and by reforming the "excessive" parole process. (See, e.g., Cal. Const., art. I, § 28, subds. (b)(1)-(13), (f)(6); *People v. Hannon* (2016) 5 Cal.App.5th 94, 99-100.)

[11] The Legislature, likewise, subsequently amended section 1202.4 to eliminate trial courts' discretion to not order direct victim restitution. (§ 1202.4, subd. (f); Stats. 2016, ch. 37 (Assem. Bill No. 2295), § 3, eff. Jan. 1, 2017.) However, courts retain that discretion with respect to restitution *fines*. (§ 1202.4, subds. (b), (c).)

"(B)  Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss.

"(C)  *All monetary payments*, *monies*, *and property collected from any person who has been ordered to make restitution shall be first applied to pay the amounts ordered as restitution to the victim.*"  (Italics added.)

The voter information materials regarding Marsy's Law include a four-page analysis by the Legislative Analyst.  (Ballot Pamp., Gen. Elec. (Nov. 4, 2008) analysis, pp. 58-61 (hereafter, Pamphlet).)[12]  Very little of that analysis relates to the restitution provision.  For example, only a single paragraph describes the "Changes Made by This Measure" with respect to restitution:

"This measure requires that, without exception, restitution be ordered from offenders who have been convicted, in every case in which a victim suffers a loss.  The measure also requires that any funds *collected by a court or law enforcement agencies* from a person ordered to pay restitution would go to pay that restitution first, in effect *prioritizing those payments over other fines and obligations* an offender may legally owe."  (Pamphlet, *supra*, analysis, at p. 58, italics added.)

Within the Legislative Analyst's two-page analysis of the fiscal impact of Marsy's Law, only the following two paragraphs address the measure's restitution provision:

"The changes to the restitution process contained in this measure could affect state and local programs.  Currently, a number of different state and local agencies receive funding from the fines and penalties collected from criminal offenders.  For example, revenues collected

---

12     In her reply brief, Joya "objects" to Administrator's appending of the Pamphlet to her respondent's brief.  The objection is not well-taken inasmuch as courts are authorized to consider such material when construing an ambiguous ballot measure.  (*Arroyo*, *supra*, 62 Cal.4th at p. 593.)  Moreover, the material was before the probate court, and Joya discussed it in her opening brief on appeal.

13

from offenders go to counties' general funds, the state Fish and Game Preservation Fund for support of a variety of wildlife conservation programs, the Traumatic Brain Injury Fund to help adults recover from brain injuries, and the Restitution Fund for support of crime victim programs. *Because this initiative requires that all monies collected from a defendant first be applied to pay restitution orders directly to the victim, it is possible that the payments of fine and penalty revenues to various funds, including the Restitution Fund, could decline.*

"However, any loss of Restitution Fund revenues may be offset to the extent that certain provisions of this initiative increase the amount of restitution received directly by victims, thereby reducing their reliance on assistance from the Restitution Fund. Similarly, this initiative may also generate some savings for state and local agencies to the extent that increases in payments of restitution to crime victims cause them to need less assistance from other state and local government programs, such as health and social services programs." (Pamphlet, *supra*, analysis, p. 61, italics added.)

## B. *Analysis*

By its express terms, the restitution priority provision of Marsy's Law grants priority to a victim's claim when money is "*collected* from any person who has been ordered to make restitution . . . ." (Cal. Const., art. I, § 28, subd. (b)(13)(C), italics added.) This phrase is ambiguous—although it makes clear *whose* funds must be collected, it does not make clear what it means *to collect*. Based on the overall statutory scheme regarding restitution orders, the information before the voters, and consideration of the consequences of the parties' proffered interpretations, we conclude that, for purposes of Marsy's Law, the marshalling of a decedent's assets by a court-appointed administrator operating under the Independent Administration of Estates Act does not constitute collection of money from a person who has been ordered to pay victim restitution.

Within the overall statutory scheme of restitution orders, several statutes directly address affirmative, active measures government entities may (or, in some instances, *must*)

14

take to collect money from an offender who has been ordered to pay victim restitution or a restitution fine. For example, section 2085.5, subdivision (c) *requires* the Department of Corrections and Rehabilitation to deduct funds from a prisoner's wages and trust account deposits and to transfer those funds to the California Victim Compensation Board (Board) "for direct payment to the victim."[13] Similarly, for an offender serving a prison term in local custody, subdivision (d) of section 2085.5 authorizes the designated local agency to deduct funds from the prisoner's wages and trust account deposits and to transfer them to the Board "for direct payment to the victim." Similar deduction provisions apply for collection of funds to satisfy restitution *fines* owed to the state. (See § 2085.5, subds. (a) & (c).)

Similar provisions apply when a prisoner released from custody has not yet fully paid a restitution order or fine. The obligation to pay the unpaid balance survives the prisoner's release, and the designated local agency is authorized to "collect" the unpaid balance. (See §§ 2085.6, subds. (a) & (b), 2085.7, subds. (a) & (b).)

The Franchise Tax Board (FTB) is also authorized to "collect[]" delinquent restitution orders and fines. (Rev. & Tax. Code, § 19280, subd. (a).) Upon referral by a government entity (*id.*, § 19280, subd. (a)(2)(B)), the FTB is authorized to collect restitution

---

[13]    Section 2085.5, subdivision (c) states in part: "If a prisoner owes a restitution order imposed pursuant to . . . Section 1202.4 . . . , the secretary shall deduct a minimum of 20 percent or the balance owing on the order amount, whichever is less, up to a maximum of 50 percent from the wages and trust account deposits of a prisoner, unless prohibited by federal law. The secretary shall transfer that amount to the California Victim Compensation Board for direct payment to the victim, or payment shall be made to the Restitution Fund to the extent that the victim has received assistance pursuant to that program. . . ."

15

orders "in any manner authorized under the law for the collection of a delinquent personal income tax liability . . . ."  (Rev. & Tax. Code, § 19280, subd. (c).)

The statutory scheme regarding restitution also addresses collection activities by courts.  For example, section 1202.42 directs courts, "[u]pon entry of a restitution order," to "enter a separate order for income deduction" that will be stayed until the "agency . . . responsible for collection of restitution" informs the court "that the defendant has failed to meet his or her obligation under the restitution order" without good cause.  (§ 1202.42, subds. (a)-(b).)  "The income deduction order shall direct a payer to deduct from all income due and payable to the defendant the amount required by the court to meet the defendant's obligation."  (§ 1202.42, subd. (c).)

Courts are also authorized to grant prosecuting attorneys authority to use lien procedures, including writs of attachment of property, "[i]f the defendant has failed to meet his or her obligation under the restitution order and the defendant has not provided good cause for the failure . . . ."  (§ 1202.42, subd. (g).)

Finally, when a criminal defendant has deposited cash bail with the court, upon exoneration of the bail the court is authorized to "apply the money in satisfaction" of any amounts owing for restitution orders or fines before "refund[ing] the surplus, if any, to the defendant."  (§ 1297.)

From these examples, we observe that statutory references to the collection of money to satisfy restitution orders (or fines) contemplate active, affirmative steps to secure the funds—deducting them from an inmate's wages, levying them as if they were a delinquent income tax liability, deducting them from an offender's income, or depositing them in a

16

court account as security for a defendant's liberty pending trial. The probate court's involvement in Decedent's estate does not rise to this level of affirmative activity.

The court granted Administrator "full authority . . . to administer the estate without court supervision under the Independent Administration of Estates Act." As noted (see fns. 1 and 2, *ante*), this included the obligation to marshal Decedent's assets, and included the authority to sell property and approve or reject claims without court approval. Under such a broad delegation of authority, the court's attenuated connection to Decedent's estate property is unlike the degree of direct, affirmative conduct exercised by government entities under the statutory framework set out above. The cases Joya cites regarding a probate court's constructive possession of estate property held by an administrator are inapplicable to the circumstance before us.[14]

In addition, the Legislative Analyst's assessment of the fiscal impact of the restitution priority provision—a possible "decline" in "fine and penalty revenues"—supports our interpretation of the phrase "collected from." Were Joya's construction correct, the fiscal impact to the state could be dramatic—a victim entitled to restitution could theoretically assert priority over a state or county tax lien. The fact the Legislative Analyst did not address this potentially drastic impact indicates voters did not give the measure the meaning

---

[14] For example, *Blythe Co. v. Bankers' Inv. Co.* (1905) 147 Cal. 82 is inapposite because the cited passage is from the lengthy discussion of the case's procedural history and describes a federal court's ruling in a related proceeding. (*Id.* at p. 88.) *In re Durel* (9th Cir. 1926) 10 F.2d 448 is similarly inapposite because this federal court merely stated the general proposition that "prior to a decree of distribution [an] estate is in the custody of the law, not subject to attachment which would delay and embarrass official proceedings in the administration of the estate." (*Id.* at p. 449.) This does not relate to Joya's specific claim of priority here.

Joya attributes to it. (See, e.g., *Valencia*, *supra*, 3 Cal.5th at p. 365.) Moreover, the Legislative Analyst's fiscal analysis regarding the loss of fine and penalty revenues is consistent with the statutory restitution scheme, which now prioritizes victim restitution *orders* above restitution *fines*. (See, e.g., § 2085.5, subd. (j) ["If a prisoner has both a restitution fine and a restitution order from the sentencing court, the department shall collect the restitution order first . . . ."]; § 2085.5, subds. (k), (*l*) [designated local agencies collect restitution orders before fines]; § 1203.1d, subd. (b) [restitution victims have first priority for disbursement of restitution funds collected by the FTB at the request of a designated local agency].)

Finally, Joya's interpretation of the measure would, as Administrator contends, lead to "strange consequences." (See *Valencia*, *supra*, 3 Cal.5th at p. 358 [" 'Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation.' "]; *Simpson Strong-Tie Co.*, *Inc. v. Gore* (2010) 49 Cal.4th 12, 27 ["we may reject a literal construction that is contrary to the legislative intent apparent in the statute or that would lead to absurd results"].) For example, in addition to our tax lien example above, a victim with a restitution order presumably could assert priority in a foreclosure proceeding over an earlier-recorded first deed of trust or mechanic's lien, upsetting the economic expectations of lenders and tradesmen. Joya's reading would also give restitution orders priority over child support orders, which are the subject of strong public policy. (Fam. Code, § 4053, subd. (e) [child support guideline "seeks to place the interests of children as the state's top priority"].) We doubt the voters intended such consequences.

Our construction of Marsy's Law does not leave a crime victim without a judicial remedy to enforce a restitution order. To the contrary, an order to pay restitution is "fully enforceable by a victim as if the restitution order were a civil judgment, and enforceable in the same manner as is provided for the enforcement of any other money judgment." (§ 1214, subd. (b); see § 1202.4, subd. (a)(3)(B) ["Restitution to the victim . . . shall be enforceable as if the order were a civil judgment."]; § 1202.4, subd. (i) ["A restitution order imposed pursuant to subdivision (f) shall be enforceable as if the order were a civil judgment."].) The civil judgment-enforcement mechanisms available during a restitution debtor's lifetime are akin to the direct, affirmative governmental collection activity contemplated in the overall restitution statutory scheme.

## DISPOSITION

Affirmed. Appellant to pay respondent's costs on appeal.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.

19